MOHCURP, P.
I concur in the first opinion expressed by the District Court, that the bond “on which this action is founded ought to be regarded, for the purposes of this action, as a new transaction, unaffected by the previous dealings between the parties; which had been fully closed and settled before the execution of said bond.” Ho doubt a large portion of the amount for which that bond was given was a specie debt, in payment of which specie *might have been required ; and most of the balance of said amount was cash received of the decedent of the plaintiff in error on the 13th of Peb-ruarj, 1862, when a dollar in gold was worth only one dollar and twenty-five cents in Confederate notes. So that, on the 14th day of June, 1862, when the bond was executed, the defendant in error was indebted to the decedent of the plaintiff in error in a much larger amount than $3,822.24, in Confederate notes, as of their value at that time, which was, in comparison with gold, in the proportion of one and a half to one. The said decedent was, therefore, not bound to receive the amount then due him in Confederate notes at their par value. Still he had a right to do so, and I think did do so. If he had merely taken the bond of the defendant in- error, without more, it would probably not have been such a novation of the debt as to render it improper to look back to the period of its origin as the date at which its value was to be estimated. But he’did something more. He had a full settlement of his account with the defendant in error, and received his check for the amount due. This was a payment in full of the amount, the defendant in error then having a greater amount to his credit in the bank on which the check was drawn. If the check had been presented at bank, it would have been paid in Confederate notes, which were then in general circulation as currency in 'the city of Tynchburg, where the defendant in error resided, and the settlement was made. It may fairly be presumed, that the decedent of the plaintiff in error knew, when he received the check, that it would be paid in Confederate notes; and in consenting to receive it, .he therefore consented to receive such notes at their then par value in payment of his debt. After the check had been accepted, and it seems after the defendant in error had balanced the account on his books, the said decedent represented to *him that he had no use for the money, and that *679 it would be an accommodation to him for the defendant in error to retain it; which at length the latter agreed, as an accommodation to the former, to do; but upon condition that he should be allowed to pay it off on the 1st of January next following, and should pay interest at the .rate of four per cent, per annum only; and accordingly the bond was executed and delivered, and the check returned. I regard the substance of the transaction as a loan of the amount in Confederate notes upon the bond of the •defendant in error.
In regard to the second branch of the opinion of the District Court, I concur in it in some respects, but in others I do not. I concur in the latter part of it (and for reasons therein sufficiently set forth) which declares, that to the value which may be ascertained of the Confederate notes due on said bond, nothing should be added on account of the present depreciation of paper money as compared with gold; ‘! the court can only render judgment for money generally, without designating what is to be regarded as money; and no question can arise as to the obligation on the part of the defendant in error (plaintiff in error here) to accept payment in United States treasury notes as being, under the act of Congress, the legal equivalent of coin, until such notes shall have been tendered in payment of said judgment, and refused; and the effect of so adding to the money value of said notes a sum equal to the difference at the date of the judgment between coin and paper money, would be to make the debtor pay more or less than he ought to pay, in proportion to the rise or fall in value of paper money, with reference to coin, between the date of the judgment and the time of its payment.”
In regard to the former part of the second branch of the said opinion, which de-dares, ‘ ‘that if, according to the *true intent of the parties to the said bond, the same was payable in Confederate States treasury notes, then, upon the facts agreed, the defendant in error is entitled to recover judgment in this action for the value of the amount of such Confederate (notes, payable on said bond, scaled according to the value ■of said notes, with reference to gold, on the 1st day of January, 1863, the case agreed not furnishing the materials for applying any other scale, if any .other ought to be applied in this or in any case, as to which the court expresses no opinion,” there can be no doubt but that it was competent for the parties to the bond to agree that it should be paid in Confederate notes at their par value at the time at which the bond should become payable. The obligee could take upon himself the risk of the depreciation of the notes between the date of the bond and the (period of its maturity. But such a contract would be a contract of speculation and of hazard, which ought not to be presumed, but ought to be proved expressly, or by strong implication. The facts agreed in this case show no such contract of speculation or hazard. If the decedent of the plaintiff in error, on the 14th of June, 1862, had sold goods to the defendant in error, on a credit until the 1st day of January following, and intended to assume the risk of the depreciation of the currency in the meantime, he would of course have indemnified himself against such risk by the increased price of the goods. And an inference of such intention might have been drawn in such a case from the amount of the price of the goods. Or if the bond in this case, though for money loaned, had been expressly for the payment of the amount at the maturity of the bond in Confederate notes, (which were depreciating), as of their value at that time, strange and improvident as such a bargain would be, it would, nevertheless, be legal and binding. But this is a very different case from either of those supposed. The bond *was given here for the loan of Confederate money, which had just been received at par by the lender from the borrower, in payment of a debt, a large portion of which was a specie debt. The loan was at four per cent, interest, and the bond was for the payment of the amount loaned in numero, without specifying that it was to be paid in Confederate notes or currency. The amount received from the lender by the borrower was the value of the amount in Confederate notes at the time of the loan, and that was the just measure of the benefit derived from the loan. There is nothing in the case to indicate a contract of speculation or of hazard; but everything to indicate a contract to return a subject of the same value with that which had been loaned, with the reduced interest of four per cent, upon it. It may be said, that as the money loaned must be considered to have been Confederate money, which was then the common, if not the only, currency of the country, the money mentioned in the bond must be regarded as Confederate money, and the bond should therefore be read and construed as if it had expressly been for the payment of the amount in Confederate money. On the other hand, it may be said, that the contract, being obviously not one of hazard, but a mere loan, in which it was contemplated that the same amount in value loaned should be returned with a reduced interest thereon, the bond should therefore be read and construed as if it had expressly been for the payment of the amount in Confederate notes, as of their value at the time of the loan; or for the payment of so much specie as would be equivalent to the amount of the bond in Confederate notes, as of their value at the time of the loan. It can make no difference that the plaintiff’s decedent ‘ ‘represented to the defendant that he had no use for the money, and that it would be an accommodation to him for the defendant to retain it; which at length the defendant *agreed, as an accommodation to the plaintiff’s decedent, to do; but upon condition that he should be allowed to pay it off on the 1st of January next following, and should pay interest at *680 the rate of four per centum per annum only.” Certainly it was not intended, by either party, that the money should be kept by the defendant without being- used, until the 1st of January following, and then returned. Had such been the intention of the parties, then of course the plaintiff’s decedent would have been entitled only to the amount of the bond in Confederate notes at the time of its maturity, as of their then value. But he certainly intended to make no such improvident bargain. No man in his senses would ever have thought of treasuring up a depreciating currency. The plaintiff’s decedent had no use for the money, and rather than keep it idle and at his risk, would no doubt have loaned it to one who had use for it, without any interest at all, and upon condition only that its value at the time of the loan should be returned to him at the expiration of the credit. Hess than that would, to the same extent, have been a certain loss to him, which he could easily have avoided by buying gold, and keeping that instead of Confederate notes. The consideration stipulated for by the defendant for accommodating the plaintiff’s decedent in retaining his money was, the “condition that he should be allowed to pay it off on the 1st of January next following, and should pay interest at the rate of four per centum per annum only.” The defendant intended to use the money, or he would not have agreed to pay any interest for it. The presumption is, that he did use it, and that it was worth to him the full amount of its value at the time of the loan; and that amount, with interest at the rate of four per centum per annum from the date of the loan, seems to be the just measure of his liability to the plaintiff.
*This view would, I think, not only attain the justice of the case, but conform to the provisions and spirit of the act of Assembly passed March 3, 1866, entitled “An act providing for the adjustment of liabilities arising under contracts and wills made between the 1st day of January, 1862, and the 10th da}’ of April, 1865.” Sess. Acts 1865-6, p. 184, ch. 71. The extraordinary and anomalous condition of things produced by the war occasioned the necessity for such an act, as is plainly shown by the preamble, which recites, that “Whereas, a depreciated currency, known as Confederate States treasury notes, constituted the only or principal currency in the greater part of this State during the late war: and whereas, the result of said war involved the total destruction of said currency: and whereas, there are many contracts which were made, or obligations which were incurred, before the termination of said war, predicated on said depreciated currency, still remaining wholly or partially unadjusted, in respect to which great uncertainty exists, perplexing alike to debtor or creditor, as to the present measure of their liabilities and rights respectively; and it thus appearing useful that some uniform and equitable rule should be established for the adjustment of such mutual demands and liabilities: therefore;” and then follow the provisions made on the subject by the act. The first and second sections are as follows:
“1. Be it enacted by the General Assembly, That in any action or suit, or other proceeding for the enforcement of any contract, express or implied, made and entered into between the 1st day of January, 1862, and the 10th day of April, 1865, it shall be lawful for either party to show, by parol or other relevant evidence, what was the true understanding and agreement of the parties, either expressed or to be implied, in respect to the kind of currency in which the same was to be fulfilled or performed, *or with' reference to which, as a standard of value, it was made and entered into; and in any action at law it shall not be necessary to plead the agreement specially in order to admit such evidence.
1 ‘2. Whenever it shall appear that any such contract was, according to the true understanding and agreement of the parties, to be fulfilled or performed in Confederate States treasury notes, or was entered into with reference to such notes asa standard of value, the same shall be liquidated and settled by reducing the nominal amount due or payable under such contract, in Confederate States treasury notes, to its true value at the time they were respectively made and entered into, or at such other time as may to the court seem right in the particular case; and upon the payment of the value so ascertained, the party bound by such contract shall be forever discharged of and from the same: provided, that in all cases where actual payment has been made of any sum of such Confederate States treasury notes, either in full or in part of the amount payable under such contract, the party by or for whom the same was paid, shall have full credit for the nominal amount so paid, and such payment shall not be reduced.”
The only other section which need be noticed is the fourth, which is as follows: “4. In any case wherein it shall appear, that on any contract made, or liability incurred, on or after the 1st day of January, 1862, and before the 10th day of April, 1865,. the debtor, on or after the maturity of the claim against him, and within the period above mentioned, made to the creditor, his agent or attorney at law, a bona fide and actual tender of the amount due in the said Confederate States treasury notes, or other equal or better currency, and that the creditor then refused to accept the same, a court of equity may grant relief to the debtor, unless it ^appear that the creditor was justified in refusing to accept the amount tendered, in consequence of a substantial and decided depreciation of said currencjr after the time at which payment ought to have been made, and before the time at which the tender was made, or unless it otherwise appear to be inequitable to grant such relief.”
*681 The first section provides, that in a proceeding- for the enforcement of a contract made between the periods therein mentioned, either party may show what was the true understanding of the parties in respect to the kind of currency in which the same was to be performed, or with reference to which, as a standard of value, it was made. Confederate notes being the principal, if not the only, currency of the country during the period aforesaid, it is fair to presume, in the absence of evidence to the contrary, that any contract made during that period was intended to be performed in that kind of currency, or was made with reference thereto as a standard of value.
The second section provides, that any such contract, intended to be performed in that kind of currency, or made with reference thereto as a standard of value, shall be liquidated and settled by reducing the nominal amount due under such contract, in Confederate notes, to its true value at the time the contract was made, or at such other time as may to the court seem right in the particular case; and upon the payment of the value so ascertained, the party bound by such contract shall be forever discharged from the same. The court is thus authorized to do justice between the parties in this matter, according to the circumstances of each particular case. Where a contract was made on the 14th of June, 1862, for the loan of Confederate States treasury notes until the 1st dajT of January following, such notes being a continually depreciating currency, the date of the contract, and not the time of its maturity, is the period in reference to which the value, *of such notes should be ascertained, in order to do justice between the parties in a proceeding instituted upon such contract. Of course the creditor might have received Confederate money at par in payment of the debt; and if he received it without objection on account of the debt, the presumption is that he received it at par. The proviso to the second section, therefore, properly declares, “that in all cases where actual payment has been made of any sum of such Confederate States treasury notes, either in full or in part of the amount payable under such contract, the party by or for whom the same was paid shall have full credit for the nominal amount so paid, and such payment shall not be reduced.”
The fourth section provides, that in any case of a contract made, or liability incurred, between the periods aforesaid, and of a tender and refusal of the amount due in Confederate States treasury notes, or other equal or better currency, on or after the maturity of the claim, and within the said period, a court of equity may grant relief to the debtor, unless it appear that the creditor was justified in refusing to accept the amount tendered, in consequence of a substantial and decided depreciation of such currency after the time at which payment ought to have been made, and before the time at which the tender was made, or unless it otherwise appear that it would be inequitable to grant such relief. This section might seem, at first glance, to admit the right of a debtor in such case, as a general rule, to make payment in such notes at their par value at the maturity of the claim. But this would, I think, be inconsistent with the second section, which seems to fix upon the period when the contract was made as that at which, as a general rule, the value of such notes were to be ascertained in determining the amount to be paid by the debtor. At all events, the conclusion of the fourth section shows, that the court must determine on all the circumstances *of the case, whether it would be equitable to grant the relief which the section contemplates.
The first and second sections of the act of March 3d, 1866, were amended by an act passed February 28, 1867. Sess. Acts 1866-7, p. 694, ch. 270. The only amendment which it is necessary to notice is, a proviso added to the first section, “that when the cause of action grows out of a sale, or renting or hiring of property, whether real or personal, if the court, or (where it is a jury case), the jury think that, under all the circumstances, the fair value of the property sold, or the fair -rent or hire of it, would be the most just measure of recovery in the action, either of these principles may be adopted as the measure of the recovery instead of the express terms of the contract.” This amendment serves still further to show that the legislature, in providing a measure of relief on contracts made during the latter years of the war, having reference to the then depreciating currency as a standard of value, sought to do justice between the parties under all the circumstances of each case.
The state of things which existed in regard to the currency during the late war, and the consequent legislation before referred to, afe very similar to the state of things which existed on the same subject during the revolutionary war, and the legislation which it occasioned. The currency of the State commenced depreciating as early as January, 1777, when it stood at the rate of 1)4 to 1, compared with silver and gold, and continued to depreciate, gradually at first, and then more rapidly, until December, 1781, when it stood at the rate of 1,000 to 1, and ceased to be a currency! In November, 1781, an act was passed, entitled ' “'An act directing the mode of adjusting and settling the payment of certain debts and contracts, and for other purposes.” This act was manifestly and naturally the model of our act of March 3, 1866, before referred to, *and is, substantially, like it in most respects, both of them having been occasioned by a similar state of things. When the legislature, in March, 1866, undertook to legislate on the subject, it was proper that they should look, and they did look, for their guidance and direction, to the legislation on the same subject which followed the revolutionary *682 war. Hence the act of November, 1781, and the decisions of the Court of Appeals thereon, have an important bearing in the construction of the act of March 3, 1866, and upon the decision of this case. 'The first section of the act of November, 1781, is its preamble, setting forth the causes which led to its passage. The second section recites, that “the good people of the State will labor under many inconveniences for want of some rule whereby to settle and adjust the payment of- debts and contracts entered- into and made between the 1st of January, 1777, and the 1st of January, 1782, unless some rule shall be by law established for liquidating and adjusting the same, so as to do justice as well to the debtors as creditorsand then proceeds to enact, that “all debts and contracts entered into or made in the current money of this State, or of the United States, excepting at all times contracts entered into for gold and silver coin, tobacco or any other specific property, within the period aforesaid, now remaining due and unfulfilled, or which may become due at any future day or days, for the payment of any sum or sums of money, shall be liquidated, settled and adjusted agreeable to a scale of depreciation hereinafter mentioned and contained; that is to say, by reducing the amount of all such debts and contracts to the true value in specie at the days or times the same were incurred or entered into; and upon payment,” &c., the debtors shall be forever discharged, &c. And then follows a proviso, that actual payments in paper currency, in whole or in part, shall stand good for the nominal' amount. Note here the resemblance ^between this section and the second section of the act of March, 1866. Both of them fix upon the time at which the contract was made as the time at which the value of the depreciated currency is to be ascertained; but in .the latter these words are added, which are not in the former: “or at such'other time as may to the court seem right in the particular case.” The substance of these additional words, however, is embodied in the fifth section of the act of 1781, and the two acts may be regarded as substantially the same in this respect. The fourth section of the act of 1781 adopts a scale of depreciation including every month from January, 1777, to December, 1781, inclusive, as the rule ‘ to determine the value of the several debts, &c., compared with silver and gold. The fifth section of the act of 1781 provides, that where circumstances arise which would render a determination agreeable to the above table unjust, the court may award such judgment as to them shall appear just and equitable.
Upon the construction of the act of 1781 there have been several decisions of the Court of Appeals, some of which only will be noticed.
In Pleasants v. Bibb, 1 Wash. 8, the bond on which the action was brought was dated the 1st of Pebruarv, 1780, payable on or before the 17th of December, 1781, and to carry interest from the 16th of Rebruary, 1779. The court held that' these latter words, with other circumstances in the case, fixed the latter as the period at which the scale of depreciation ought to be applied, being the period at which the debt arose, though not reduced to a specialty until 1780. Thus we see that, to attain the justice of the case, the court here went even behind the date of the bond on which the suit was brought.
In Wilson & McRae v. Keeling, Id. 194, the reporter’s marginal abstract of the case is this: “In April, 1778, a sum. of paper money was lent, not tobe re-paid in less than ^’twelve months thereafter. The money was tendered shortly after the expiration of the twelve months, and was refused. A mortgage having been given to secure the debt, the mortgagee brought an ejectment, and recovered possession of the mortgaged premises. Upon a bill filed for relief, the mortgagee will be decreed to re-convey, upon payment of the debt according to the scale of depreciation of the day when the money was lent, (notwithstanding he had received the identical money in discharge of a specie debt, and notwithstanding the mortgagor emplojred the same in the discharge of a specie debt), without interest from the time of the tender to that of a new demand.” This case, in its circumstances, bears a resemblance to the present. The money was loaned for twelve months, and yet nobody contended that the time of the maturity of the debt was the period for applying the scale. The most the debtor contended for was, that it should be applied at the date of the loan; but the creditor contended that the debt should be regarded as a specie debt, as the money was borrowed for the purpose of discharging a specie debt, and was actually so applied. And this was the main controversy in the case. Byons, J., delivering the opinion of the court, said: “The case is too clear to be argued. This is a downright attempt to evade the law, directing the mode of settling debts contracted in paper money, without a single circumstance to countenance it.”
In Ambler v. Wyld, 2 Wash. 36, Ambler sold to Wyld, in September, 1778, houses and lots in Yorktown, the price of which was to be settled by valuers to be chosen by the„parties, one-half of which price was to be paid at the time of the valuation, and the other in a year afterwards. Ambler obtained a judgment at law against Wyld, which the latter enjoined, upon the ground that the trial was not a fair one. The Court of Chancery directed an issue, and the Court of Appeals affirmed the decree. The ^president, Pendleton, delivering the opinion of the court, said: That in October, 1778, “as soon probably as the parties met together after the valuation, Mr. Ambler received ^500, the first instalment, without objection, as according with the principles of the valuation then recently made. In autumn, 1779, when the other payment became due, the depreciation *683 was so visibly great as to make a more serious impression upon parties to former contracts; and though no rule was then established by which to graduate the scale of depreciation, every person was struck with the injury which would be sustained by a payment according to the nominal amount. Mr. Ambler, therefore, might well think himself justifiable in evading the receipt of the ¿500 nominal money, which Mr. WyId then offered to pay him. ’ ’ “Here the matter rested until the 10th of February, 1781, when the act for scaling paper monejT contracts had passed, fixing a general rule for adjusting those contracts, according to the rate of depreciation at the time they were made, but allowing a departure from that rule in particular cases, so as to meet the ideas of the parties at the time of the contract. ’ ’ Mr. Ambler supposed that the valuation, as explained by a subsequent certificate of the valuers, “entitled him to claim ¿500 specie, and he demanded that sum of Mr. Wyld, who, on the other hand, conceived that this nominal sum was to be reduced by the legal scale of September, 1778, which would bring it to ^100 only.” “It was pressed by the appellant’s counsel, that if a new trial were directed, a special direction should accompany it, pointing the jury’s inquiry to the value of the property at large, independent of the valuation fixed upon it by the persons who had made the estimate. This would be highly improper. It was not the intention of the Legislature to let men loose from their contracts, but to allow a departure from the established scale in cases where it was necessary, in order to *meet the real contract of the parties. ’ ’ Here it will be observed that the utmost extent of the claim of the purchaser was, to have the deferred instalment scaled as of the time, not at which it became payable, but at which the contract was made; and that the court construed the act for scaling paper money contracts as “fixing a general rule for adjusting those contracts according to the rate of depreciation at the time they were made, but allowing a departure from that rule in particular cases, so as to meet the ideas of the parties at the time of the contract. If this general rule applies to a scale on credit, in which the vendor may compensate himself for the risk of depreciation of the currency by demanding an increased price, a fortiori it applies to a loan of money — especiallj^ a loan at less than legal interest.
In White v. Atkins, 2 Wash. 94, which is the last case I will notice, “an agreement was made to sell land, during the existence of paper money, part of the money to be paid in June, 1780, when a conveyance was to be made, and the residue in twelve months thereafter. The money was not paid, or tendered at the day, nor was a conveyance made. Upon a bill by the vendee for a specific performance, he was, under the circumstances of the case, decreed a conveyance, upon his paying the value of the land at the time of the contract, instead of the value of the purchase money agreed upon, according to the scale of depreciation.” Such is the reporter’s abstract of the case. This decision is founded on obvious reasons. The purchaser having forfeited his contract at law, could obtain the land in equity only on such terms as the court deemed equitable, under all the circumstances. The views expressed by some of the judges in delivering their opinions, in regard to the act of 1781, are appropriate to the present occasion, and I will briefly notice some of them. Judge Roane said: “The Legislature have established this x'scale as a just rule whereby to settle paper money contracts in specie. It was no doubt made after due deliberation, and upon good information. It has been generally acquiesced in by the people of this commonwealth, and has prevented much litigation. It affords, I suppose, the best rule for ascertaining the value of the paper money, having been made by those who represented every part of the State, and had the best opportunity of judging.” Judge Roane also speaks of the date of the contract, and not the time when the money is payable, as the period in reference to which the scale is to be applied, at least as a general rule. Id. 99. Judge Lyons said: “The Legislature have established a scale by which to ascertain the sum in specie which should be paid in discharge of contracts entered into at particular periods whilst paper money was in circulation. This law was very properly passed; for otherwise the value in each particular case must have been ascertained by a jury, in the same manner as in actions for foreign money. This would have produced infinite trouble and litigation, which this law (affording, I believe, the best general rule), is wisely calculated to prevent. It is of more consequence that the law should be fixed and known, than that it should always be strictly just. The debtor is to pay according to the scale at the date of the contract, ’ ’ &c. Id. 103. The President said: “The act of 1781 furnishes a good general rule for scaling paper money contract; perhaps the best which could have been made. But it is certainly not just in all cases.” Id. 104.
I am, therefore, of opinion, that upon the facts agreed between the parties, the plaintiff in error is entitled to recover judgment in this action for the amount of the bond, scaled according to the value of Confederate States treasury notes with reference to gold on the 14th day of June, 1862, (the date of the loan, and of the bond on *whicb the action is founded), with interest thereon at the rate of four per centum per annum from the said 14th day of June, 1862, until payment.
Suppose that in this case the principal, instead of being payable on the 1st of January, 1863, had been made payable on the 1st of January, 1865, when the current value of Confederate notes had depreciated to the rate of 45 or 50 to one; would the creditor have been compelled to receive less than one *684 hundred dollars, the value in gold of $3,822.74 in Confederate notes at that time, in discharge of a loan of that amount of such notes on the 14th of June, 1862, then worth $2,548.50 in gold? Suppose the principal had been made payable on the 14th of June, 1865, three years after the date of the loan, when Confederate notes had ceased to be of any value; how then would the matter have been adjusted, if the time fixed by the contract for the payment of the debt be the true period for ascertaining the value of the notes? Would it be said that the borrower, who had received and enjoyed what was equivalent to $2,548.50 in gold, was bound to pay nothing in return? Such a solution of the difficulty would shock the understanding and the feelings of mankind. And yet, it seems to me, that a rule which makes the day for the maturity of the debt the period for fixing the value of its amount in Confederate notes, must inevitably lead to such a result. What intermediate period between the date of the contract and the maturity of the debt can be fixed upon, with any reason or propriety, for the purpose of ascertaining such value? We are driven by necessity to an election between these two periods as a general rule. By electing the date of the contract, I think perfect justice, or as near an approach to it as possible would be attained in most cases. The debtor would pay the value of what he received, and the creditor would receive the value of what he parted with. This result, if *not precisely what the parties intended or contemplated, is yet as near an approximation to it as can be made in the extraordinary condition of things in which the war has left us. It is, we may well suppose, what the parties would have expressly prescribed by their contract had they foreseen what was to happen. The general rule for which I contend conforms, as we have seen, to the act of 1781 and the adjudications under it, and thus is sustained by the wisdom, experience and example of our ancestors under the same trying circumstances. And it also conforms, I think, to the true construction of the act of March 3, 1866, passed in imitation of the same example, and under the same circumstances. On the other hand,' by electing the time of the maturity of the debt instead of the date of the contract as the period, the rankest injustice would be done in a large majority of the cases, and a result arrived at which neither party could have contemplated. I therefore think the date of the contract is the proper period for applying the scale of depreciation in such cases, as a general rule. Of course there . are exceptions to it, which must be left to the determination of the court or jury under all the circumstances. Sometimes an earlier, and sometimes a later, period than the date of the contract may be the proper period for applying the scale. Where it appears that the parties, in making their contract, contemplated a continued depreciation of the currency, and it was understood that the creditor was to run that risk, then it was a contract of hazard on his part, and he must abide the consequences, even though they involve a total loss of the money. I do not regard the contract in this case as a contract for the sale of a commoditj’', and therefore I do not think that the principle recognized in the cases of Beirne v. Dunlap, 8 Leigh 514, and Butcher v. Carlile, 12 Gratt. 520, apply to the case. The lender had no idea of selling, nor the borrower of buying Confederate notes, *but the transaction was purely one of a lending and borrowing of money, having reference to Confederate notes as a standard of value, and as a medium and measure of the loan, because, and only because, it was then the only, or almost only, currency of the country.
But if, as a general rule, the day when the debt became payable is the period at which the scale must be applied, I am of opinion that this case is an exception to that rule, and that in this case the date of the contract is the proper period. Indeed, I have great difficulty in saying that, in my opinion, this is not a specie contract. The money loaned was derived chiefly from specie funds, and the loan was at a time when there was comparatively slight depreciation in the value of Confederate notes. When, therefore, money thus derived, and derived from the borrower himself, was loaned out for six or seven months at four per cent, per annum interest, the borrower giving his bond for so much money, precisely as if it were a specie debt, and without any reference to Confederate notes; it may well be argued, that it was intended by both parties to be a specie debt. They doubtless supposed, as most people in the Confederate States then supposed, that the war would soon terminate favorably to them, and that Confederate notes would soon be equivalent, or nearly so, to specie. I doubt not it was contemplated, however, that if, when the monejT became payable, Confederate notes were still the currency, and of the same or nearly the same value as at the date of the contract, they should be received at par in payment of the debt, and I doubt not they would have been so received if tendered. Perhaps, notwithstanding the great depreciation in the meantime, if the lender had been alive when the debt became payable, and the borrower had then tendered the amount in Confederate notes, the lender would have received them, as some continued to receive such notes in payment of ^specie debts down almost to the end Of the war. If that had been done, the transaction would have been settled by the voluntary act of the parties. But as that was not done, and the transaction was left unsettled at the end of the war, we must now settle it according to the rights of the parties, and the mode, in my opinion, of doing so has already been indicated.
In regard to the third branch of the opinion of the District Court, to wit, “that the case agreed is too uncertain to enable the court to pronounce judgment upon it, be *685 cause it does not state whether the said bond, according to the true intent oí the parties, was or was not payable in Confederate treasury notes,” I have shown by what I have already said that I do not concur in it. I think the case agreed is sufficiently certain to enable the court to pronounce the judgment upon it which I have before indicated. All the facts which actually occurred in the case, and which are material, are no doubt included in the case agreed; and according to those facts, the case comes within the general rule which fixes the date of the contract as the period at which the scale of depreciation is to be applied.
It cannot be presumed that any other facts existed which would make the case an exception to the general rule. If such facts existed, they ought to have been included in the case agreed, and not being so included, it must be presumed that they did not exist. If it be said, that the fact that the contract sued on was entered into with reference to Confederate States treasury notes as a standard of value, though it be necessarily inferable from the facts agreed, is nevertheless a fact which ought itself to have been expressly included in the case agreed, the answer is, that the parties waived their right to have a jury, and referred the case to the decision of the court; and although they agreed the facts of the case, yet it was '*incutn-bent on the court to draw all necessary and proper inferences from those facts which a jury would have drawn if the case had been tried by a jury on the same agreement of facts. It is not like the case of a special verdict or case agreed in lieu of a special verdict, in which the court, having no right to decide any question of fact, must award a venire de novo in order to ascertain a material fact, though it be properly, or perhaps necessarily, inferable from the facts found or agreed, but it is a case in which the whole matter of law and fact is to be heard and determined by the court.
My conclusion, therefore, is, that so much of the judgment of the District Court as is in conflict with the foregoing opinion is erroneous, and ought to be reversed, and the residue thereof affirmed, and a judgment entered in conformity with the said opinion. But as my brethren are of a different opinion, a judgment must be entered in conformity with their views.
RIVES, J., concurred in the opinion of Joynes, J.
Judgment of both the district and Circuit Courts reversed, with costs to the appellee.